UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| JUDY R. SMITH | ) | |
| | ) | |
| V. | ) | NO. 2:14-CV-282 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review of the Commissioner's final decision denying the Plaintiff's applications for disability insurance benefits and widow's survivor benefits under the Social Security Act. These applications were denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. The Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 20], while the Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 22].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal*

*Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 52 years of age at the time of her alleged onset of disability on April 26, 2010, and is 56 now. She has a high school education. It is undisputed that she cannot return to her past relevant work as an electronic production worker or as an auto part assembler.

The Plaintiff's relevant medical history is set forth in the Commissioner's brief as follows:

> In April 2010, Plaintiff went to the emergency room with anxiety (Tr. 207-09). She said that, since her husband committed suicide, she had been drinking on weekends to self-medicate (Tr. 207). On examination, she appeared anxious and depressed, and she said she took medication that did not help (Tr. 207-08). A medical provider diagnosed an acute anxiety attack and prescribed new medication (Tr. 209).
> The next day, Plaintiff went to The Doctors Office and requested increased medication and a note for sick leave at work (Tr. 245-46).
> A week later, in May 2010, Plaintiff went to the emergency room after a medication overdose and possible suicide attempt (Tr. 213-37). She said she had taken "a lot" of pills and drunk "a lot" of alcohol (Tr. 214, 216, 221). She was admitted to the hospital for inpatient care, where she was placed on detoxification, fall, and seizure precautions (Tr. 214-15, 226).
> A week later, Plaintiff had stabilized to the point that she was discharged

from the hospital (Tr. 226). She was assigned a global assessment of functioning (GAF) score of 30 upon admission and 60 upon discharge (Tr. 227). On discharge, her prognosis was good with continued follow-up (Tr. 227).

Later in May, Plaintiff saw Charles Gaines, D.O., for a psychiatric evaluation (Tr. 262- 63). She reported that she began drinking daily after her husband died and that her anxiety and depression always got worse around the anniversary of her husband's death in May (Tr. 262). On examination, she had a fair mood and consistent affect (Tr. 262). Her speech was normal, her concentration was good, and her insight and judgment appeared intact (Tr. 262). Her thoughts were logical, coherent, and goal-directed (Tr. 262). Dr. Gaines diagnosed depression and alcohol dependence in early remission and assigned a GAF score of 55 (Tr. 263).

Plaintiff saw Dr. Gaines in July 2010 for medication management approximately monthly from in July, August, and November 2010, and January 2011 (Tr. 264-70). On examination, she was cooperative and pleasant (Tr. 264-65, 270). Her thoughts were logical, linear, and goaldirected (Tr. 264-65, 270). In July, she described her mood as "tore-up" (Tr. 264). In November, Dr. Gaines noted that she continued to binge alcohol and become suicidal when intoxicated (Tr. 266). Dr. Gaines opined that Plaintiff's motivation was currently devoted to obtaining disability benefits rather than recovering (Tr. 266). In January, Plaintiff reported that she was a "nervous wreck all the time" and could not return to work (Tr. 270). She tolerated her current medications well, which Dr. Gaines described as "efficacious" (Tr. 270).

In April 2011, Plaintiff saw mental health nurse practitioner Karen Dewitt for medication management (Tr. 271-72). Plaintiff reported better energy and said she was sleeping well at night (Tr. 271). She said she helped her sister care for their parents (Tr. 271). Her mood was depressed, but she denied suicidal thoughts (Tr. 271). She showed no adverse side effects and no evidence of medication misuse (Tr. 271). Ms. Dewitt continued Plaintiff's medications and recommended that she continue in individual therapy on a regular basis (Tr. 272). Ms. Dewitt also discussed counseling and alcoholics anonymous, as well as grief support groups (Tr. 271).

In July 2011, Plaintiff saw a social worker for a court-ordered substance abuse assessment (Tr. 274-83). She said that she had been drinking a 12-pack of beer on the weekends and 1 beer every morning to avoid tremors (Tr. 279). The social worker recommended that Plaintiff enter a residential care treatment facility at once, after which she could follow up with an intensive outpatient treatment group (Tr. 275, 283). The social worker assessed alcohol dependence, depression, and anxiety, and assessed a GAF score of 41 (Tr. 282).

Plaintiff saw Shana Hamilton-Lockwood, Ph.D., in October 2011, at the request of the state agency, for a psychological evaluation (Tr. 297-301). Plaintiff acknowledged that she used to drink alcohol heavily on a regular basis, but she said she had been clean since Labor Day (Tr. 298). She currently attended intensive outpatient therapy twice weekly (Tr. 298). On examination, she

3

appeared depressed and anxious (Tr. 301). She showed average intelligence, moderate impairment in short-term memory, moderate impairment in concentration, and no impairment in long-term or remote memory (Tr. 300). She showed no impairment in social relating, and mild impairment in her ability to adapt to changes (Tr. 301). She appeared able to follow written and oral instructions (Tr. 301). Dr. Hamilton-Lockwood assessed alcohol dependence in early remission, depression, anxiety, brain disorder, post-acute alcohol withdrawal, insomnia/nightmares, and left hip bursitis, and assessed a GAF score of "53-58" (Tr. 301).

In March 2012, Plaintiff went to Frontier Health to have her case reopened (Tr. 373, 395-400). She reported depression and anxiety that worsened every year around Mother's Day (Tr. 395). She also reported that she was looking for work (Tr. 395, 399). A medical provider assessed depression and alcohol dependence in remission and assigned a GAF score of 45 (Tr. 396).

The next month, Kenneth Greenwood, M.D., saw Plaintiff for a psychiatric evaluation (Tr. 393-94). Plaintiff said she took Prozac, which she did not feel was working well enough (Tr. 393). She also said she was looking for work and had benefited from therapy in the past (Tr. 393). On examination, Plaintiff appeared anxious and depressed (Tr. 394). She was alert, calm, and cooperative, established rapport, and conversed appropriately (Tr. 394). Her perception was clear and her thought processes intact. She showed organized and goal-directed thinking with normal rate and flow (Tr. 394). She showed no evidence of dangerousness to herself or to others (Tr. 394). Dr. Greenwood assessed depression, anxiety, and alcohol dependence in remission, and assessed a GAF score of 54 (Tr. 394). Dr. Greenwood prescribed medication and advised Plaintiff to attend psychotherapy and/or case management (Tr. 394).

Plaintiff returned to Dr. Greenwood for medication management in June, August, and December 2012 (Tr. 390-92). In June, she said she had benefitted from medication, but was not fully improved like she had hoped (Tr. 392). She was still taking part in Alcoholics Anonymous and maintaining sobriety (Tr. 392). On examination, she had a fair mood and showed goal-directed and sequential thoughts (Tr. 392). In August, Plaintiff said she was doing fairly well and was helping her mother with some yard work and house renovation (Tr. 391). She showed a good mood and goal-directed thoughts (Tr. 391). In December, Plaintiff had had no problems with medication side effects, was staying clear of alcohol use, and was eating well (Tr. 390). She continued to show a good mood and goal-directed thoughts (Tr. 390).

In February 2013, Plaintiff saw counselor David Brown for psychotherapy (Tr. 389). Plaintiff reported several bouts of depression monthly, and she appeared anxious and depressed (Tr. 389). She said her depression affected her daily activities and would interfere with work-related activities if she were working (Tr. 389). She was not able to remain emotionally stable if she thought something catastrophic was going to happen (Tr. 389).

The next day, Mr. Brown and Dr. Greenwood signed an opinion form (Tr.

4

385-88). Mr. Brown and Dr. Greenwood checked boxes on the form indicating that Plaintiff had moderate limitations in 17 out of 20 listed mental abilities, as well as marked restrictions in 2 of the listed abilities (Tr. 386-87). Mr. Brown and Dr. Greenwood opined that any perceived or real threat to Plaintiff's status quo caused severe emotional breakdowns, and that Plaintiff would not be able to function in a structured work environment without having emotional breakdowns (Tr. 387). Mr. Brown and Dr. Greenwood also opined that Plaintiff tended to harm herself when she "[felt] bad for too long" (Tr. 387).

[Doc. 23, pgs. 2-6].

On March 21, 2013, the Plaintiff's administrative hearing was held before the ALJ. After Plaintiff testified, the ALJ heard the testimony of Dr. Robert Spangler, a vocational expert ["VE"]. Dr. Spangler first opined as to the exertional requirements of Plaintiff's past relevant work as an electronics production worker and as an auto parts assembler. (Tr. 49). He was then asked by the ALJ "to assume physically that she [the Plaintiff] is restricted to medium exertion activity with no climbing of ladders, ropes or scaffolds and no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching or crawling. Mentally, assume that she is only able to perform and maintain concentration for simple routine repetitive tasks. Assume that she is able to adapt to routine changes in the work setting. And finally, assume she's limited to work that requires no more than occasional public interaction." After opining that the Plaintiff could not return to her past relevant work with those limitations, Dr. Spangler was asked if there were other jobs such a person could perform. Dr. Spangler said that "[a]t medium simple routine repetitive" there would be 1, 411,526 jobs in the national economy and 33,574 in the Tennessee. However, he stated that these totals would be reduced by 40% because of the Plaintiff's additional limitations. (Tr. 50). Reduction by this percentage

5

would leave 846,915 jobs in the nation and 20,144 in the state. (Tr. 24).

Dr. Spangler also opined that if the Plaintiff had "substantial loss or a marked loss in her ability to perform at least one of the basic mental demands of unskilled work…" she would not be able to perform any job. Plaintiff's counsel asked if there would be any jobs if the Plaintiff "were required to leave work during the eight-hour workday to attend weekly for at least a one, one and half-hour medical appointment." Dr. Spangler stated that there would not be since she would be terminated for doing that. (Tr. 51).

In his hearing decision rendered April 2, 2013, the ALJ stated that the Plaintiff met the insured status requirements for disability insurance benefits and was within the prescribed period for disabled widow's benefits. (Tr. 15).

He then found that the Plaintiff had severe impairments of lumbar spine degenerative disc disease, bursitis of the hips, reduced range of motion in the cervical spine, and major depression which was moderate and recurrent along with anxiety disorder. He found that the Plaintiff did not have severe impairments of a club foot, a brain disorder, post-acute alcohol withdrawal, insomnia, nightmares or substance abuse. (Tr. 16).

The ALJ then stated that the Plaintiff did not meet or medically equal in severity any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. In so doing, he made findings with respect to the degree of restriction Plaintiff had in various areas. With regard to activities of daily living; social functioning; and concentration, persistence or pace, he found that the Plaintiff had moderate restrictions. He also found that the

6

Plaintiff had one or two episodes of decompensation of extended duration. These are the "B" criteria of the mental listings under consideration by the ALJ, 12.04 and 12.06. To meet the standard of the "B" criteria, a Plaintiff must show a marked limitation in two of the three areas, or in one area with repeated episodes of decompensation, each of extended duration. Under Listing 12.04, if a person does not meet the B criteria, they may still be disabled if they meet the "C" criteria, which would require an affective disorder that had a "medically documented history…of at least 2 years duration that caused more than a minimal limitation of ability to do basic work activities, and either (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that caused the claimant to decompensate after a minimal increase in mental demands; or (3), a current history of one or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. Here, the ALJ found that she met neither the requirements of paragraphs B nor C. Regarding Listing 12.06, he found that the evidence did not support the finding that the Plaintiff's anxiety resulted in a complete inability for Plaintiff to function outside her home. (Tr. 17-18).

He then stated his finding with respect to the Plaintiff's residual functional capacity ["RFC"]. The ALJ found that she could "perform medium work…which includes no climbing ropes or scaffolds; no more than occasional climbing ramps and stairs; stooping; kneeling; crouching; or crawling; and mentally she is able to perform and maintain concentration for simple, routine; repetitive tasks; adapt to routine changes

in the work setting; and is limited to work that requires no more than occasional public interaction." (Tr. 18). He then described the process used in making this determination. First, he determined that the Plaintiff had "an underlying medically determinable physical or mental impairment…shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's pain or other symptoms." Second, once this had been done, he must evaluate the extent to which they limit the Plaintiff's functioning. To do this, he must gauge the Plaintiff's credibility. (Tr. 18-19).

The ALJ then discussed the medical evidence. He noted "very limited treatment" for her physical complaints, particularly the consultative examination by Dr. Blaine which, other than some reduced range of motion in the cervical spine and hips, showed essentially normal findings in walking, squatting and strength. (Tr. 19).

He then discussed in great detail the treatment records regarding the Plaintiff's anxiety and depression. He noted that he Plaintiff's husband had passed away, and she was understandably depressed over this. She was first treated by Dr. Andy Roberts who prescribed Xanax. He recounted the treatment she received from Nolachuckey Holston Area Mental Health and Woodridge Hospital, including the examination and follow-up treatment by Dr. Charles Gaines. He noted that Dr. Gaines said the Plaintiff was cooperative and alert, and appropriately conversed and answered questions. The ALJ mentioned that the Plaintiff cancelled her appointment with Dr. Gaines on July 18, 2011, and did not return. (Tr. 20).

8

The ALJ then discussed the results of the consultative examination by Dr. Shana Hamilton-Lockwood. While the Defendant appeared depressed and anxious, the doctor noted she was coherent, easy to understand, and had logical thought processes. Her mental status examination was essentially normal in many respects. He then recounted the treatment records of Dr. Kenneth Greenwood, the Plaintiff's treating psychiatrist during the period from March 9, 2012 to February 27, 2013. Dr. Greenwood saw the Plaintiff on April 3, 2012 for a mental status examination. She was found to be alert, oriented, calm and cooperative, with good eye contact and appropriated conversation. Her thought associations were intact and her thinking was organized and goal directed. Follow-up examinations were held on June 7th and December 20th of 2012. Mental exams during these visits noted similar results. (Tr. 20).

However, when the Plaintiff returned to Dr. Greenwood on February 26, 2013, the mental status exam showed that the Plaintiff was "anxious and worrisome with a depressed mood," although she was not showing any suicidal or homicidal ideations. Plaintiff's attorney provided Dr. Greenwood with an evaluation form which he completed on February 27, 2013. He opined that the Plaintiff showed a "pervasive loss of interest in most activities; sleep disturbance; psychomotor agitation or retardation; feelings of guilt or worthlessness; and hallucinations, delusions or paranoid thinking." The ALJ contrasted this with Dr. Greenwood's treatment notes which showed a lack of these particular symptoms, noting that they appeared to be based upon the Plaintiff's subjective complaints. He did find that Dr. Greenwood's opinion that the Plaintiff "had decreased

9

energy and difficulty concentrating or thinking is consistent with the medical evidence of record." (Tr. 21).

The ALJ stated that the Plaintiff testified that she had trouble with people in general, and that although she lived alone, she was less than 20 feet from her mother's house, and that her mother fixed her meals and picked up around Plaintiff's house. Plaintiff reported she went to therapy each week and kept her appointments, as well as attending AA meetings. (Tr. 21).

While the ALJ found that her impairments could cause Plaintiff's symptoms, her statements about the intensity and limiting effects were not entirely credible. He noted her bursitis was present at the same level of severity when she was working prior to the alleged onset date. He found that this strongly suggested that her bursitis would not prevent work in the present. As for her mental symptoms, the ALJ noted that while she received treatment from Nolachuckey until April 25, 2011, she did not seek further treatment until March 9, 2012, when she contacted Frontier Health. In a function report, she stated she could prepare simple meals daily, clean, paint, and do laundry. He contrasted this with her testimony at the hearing that her mother did virtually all of these things for her. Thus, the ALJ, as finder of fact, found that her testimony was "not supported by the medical and other evidence of record." (Tr. 21).

He then assigned weight to the opinion evidence and the reasons for it. He found that the State Agency doctors' physical assessments were given some weight, including Dr. Briggs' opinion that she could perform medium work. However, he found that the

10

Plaintiff was more limited physically in other areas than Dr. Briggs opined, and did not give his opinion weight in those areas. Likewise, he gave some weight to Dr. Blaine, where his examination findings and the other evidence supported him, but found his opinion that Plaintiff "could stand or walk for four to five hours in an eight-hour workday are not well supported by medical acceptable clinical findings and are inconsistent with his stated objective findings." The ALJ pointed out examples in Dr. Blaine's exam findings to support the weight assigned to his opinion. (Tr. 22-23).

The ALJ gave some weight to Dr. Hamilton-Lockwood, the consultative mental examiner, but found her opinions that the Plaintiff had a brain disorder, was in post-acute alcohol withdrawal, and that she had insomnia and nightmares were not supported by the record, but apparently based upon Plaintiff's subjective complaints. He also gave some weight to the State Agency psychologists to the extent that they opined that the Plaintiff had no more than moderate impairments in her various functional abilities. However, he did not agree with them that the Plaintiff met Listing 12.09 for alcohol dependence, given her regular attendance at AA meetings and the fact that her alcoholism was in remission since September 5, 2011. (Tr. 22).

He then addressed the opinions of Dr. Greenwood, the treating psychiatrist, giving him little weight. He noted that Dr. Greenwood found Plaintiff to have moderate limitations in nearly all the areas of the form, and had a markedly impaired ability to complete a normal workday and workweek with her problems. The ALJ found these findings at odds with his treatment records discussed above. He did agree with Dr.

11

Greenwood's opinion that the Plaintiff was impaired in working with the general public. (Tr. 22).

He found that the Plaintiff could not return to any of her past relevant work, but with her age, education and work experience that she would be found not disabled under the medical-vocational guidelines [the "Grids"] if she could perform the full range of medium work. Since her severe impairments would prevent the full range of work at that level, he relied upon the findings of the VE that there were a substantial number of jobs in the national and regional economies which the Plaintiff could perform. Accordingly, he found that she was not disabled. (Tr. 23-24).

The Plaintiff raises four assignments of error regarding the ALJ's decision: (1) she asserts that "the ALJ erred in finding that the Plaintiff does not have a severe impairment or combination of impairments that have significantly limited her ability to perform basic work related activities for twelve consecutive months." (2) The Plaintiff maintains that the ALJ erred in finding her not completely credible. (3) She states that the ALJ erred in finding "that, considering the Plaintiff's age, education, work experience, and residual functional capacity, the Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy at medium exertion." (4) She claims that "the ALJ erred in not considering the non-exertional limitations as stated by Dr. Kenneth K. Greenwood, the Plaintiff's mental health provider."

In arguing the first and third issues listed above, the Plaintiff states that "the ALJ

12

erred in finding that the claimant does not have a severe impairment and had the residual functional capacity to perform medium work." The ALJ did find that the Plaintiff had various severe impairments, and that they limited her ability to work to the extent of the RFC which the ALJ found and incorporated into his hypothetical question to VE. The real question is whether there was substantial evidence to support the RFC finding. Plaintiff asserts that the RFC is inaccurate because "[t]he ALJ never incorporated into his hypotheticals the uncontradicted restriction of the Plaintiff that it was necessary for her treatment to be seen by a doctor, a therapist, or a case work at least once a week for 1-1½ hours." Also, the Plaintiff points out that on cross-examination, the VE said that Plaintiff would be terminated for missing work and that there were thus no jobs she could perform.

In her testimony, the Plaintiff stated that she sees her case worker, Melinda Stewart, in her home every other week for roughly an hour to an hour and a half. She stated that once a week on the weeks between these weeks, she sees her therapist David Brown, presumably at his office. She stated that those visits were "during business days" and "like from 9 to 5." (Tr. 44-45).

Quite frankly, it sounds highly improbable that these weekly visits could not be scheduled in such a way as to accommodate a work schedule for the Plaintiff. The unsettling consequence of the Court heading down such a path is that all a person would have to do to automatically qualify for Social Security benefits is to arrange a visitation schedule of this nature with a therapist and insist on seeing them once a week "during

13

business hours," and make sure that appointment is on a day when the patient would be expected to be at work. Nothing in the notes from Dr. Greenwood, with whom the therapist and the case worker are employed, suggests the necessity for an inflexible schedule of visits. Undoubtedly, they treat other patients with jobs whom they see regularly and accommodate their work schedules. Of course, if Dr. Greenwood's assessment is entitled to great weight in all respects then the Plaintiff is totally incapable of any work anyway. That is the real issue in this, and it will be addressed next. But the purported inability to work around the weekly schedule by itself is not a sufficient basis to find the Plaintiff disabled.

Dr. Greenwood was a treating source, and under the regulations, his opinion was entitled to controlling weight, but only if it is well-supported by clinical and laboratory diagnostic findings and is not inconsistent with the other substantial evidence of record. *See* 20 C.F.R. § 1527(d)(2). Under that same section, if controlling weight is not given to the treating source, the Commissioner is required to give "good reasons" for not doing so, not only to explain it to the claimant, but so that a reviewing court can evaluate whether the reasons are, in fact, good. *See*, SSR 96-2p. *See also Allen v. Commissioner of Soc. Security*, 561 F.3d 646, 651 (6th Cir. 2009).

The ALJ gave several reasons for not giving Dr. Greenwood's opinion controlling weight, and for giving it little weight. First, he found that his mental status evaluations from the Plaintiff's visits, which were several months apart with him personally, showed the Plaintiff to be alert, calm and cooperative. She made eye contact and established

14

rapport, provided information and conversed appropriately during these visits. (Tr. 390-394). Also, Dr. Greenwood's notes did not describe the Plaintiff as a person drifting aimlessly from one bout of depression to the next, but as one whose thoughts were organized and goal-directed with no feelings of being hopeless or helpless. (Tr. 390-394).

The ALJ also found that most of the levels of severity expressed in the form Dr. Greenwood filled out (Tr. 385-389) seemed to be based primarily on the Plaintiff's subjective complaints. Plaintiff saw Mr. Brown, the therapist who works with Dr. Greenwood, on February 25, 2013, the day before Dr. Greenwood and Mr. Brown completed the form. (Tr. 389). At that visit she apparently only saw Mr. Brown, and the note of the visit reflects that Plaintiff "presented with anxious and worrisome affect, mood depressed." This contrasts markedly with the records of the three previous visits where she met with Dr. Greenwood on June 7, 2012 (Tr. 392; August 27, 2012 (Tr. 391); and December 20, 2012 (Tr. 390). Realizing that assessments by psychiatrists often depend on interpretations of subjective complaints rather than "laboratory techniques," the Court can nonetheless certainly understand the ALJ, as the finder of fact, coming to the conclusion that the opinions on the form were based largely on those subjective complaints after a fresh recitation of them by the Plaintiff the day before they completed the form.

There was also substantial evidence to support the ALJ's giving little weight to Dr. Greenwood's assessment in the opinions of the State Agency psychologists and

15

psychiatrists. For example, Dr. Duncan Currey opined on February 7, 2012, that the Plaintiff had only a mild degree of limitation in her activities of daily living and in maintaining social functioning, and a moderate difficulty in maintaining concentration, persistence or pace. (Tr. 365). In his written opinion, Dr. Currey stated that "the severity alleged (by Plaintiff) is inconsistent with the evidence in the file," and that she had "no more than moderate impairments." (Tr. 367). Dr. Annette Brooks-Warren opined Plaintiff had no limitation from her affective disorder in activities of daily living and maintaining social functioning, and only a mild limitation in concentration, persistence or pace (Tr. 315). While it is true that Dr. Brooks-Warren had a different opinion of the level of severity in these areas with regard to the effects caused by Plaintiff's alcohol abuse, those levels appear to be linked to Plaintiff's state while experiencing the effects of withdrawal from alcohol use. At the time of Dr. Brooks-Warren's assessment on November 12, 2011, Plaintiff had maintained sobriety since September of 2011. The ALJ found that this was no longer a factor at the time of his decision in April of 2013. Even the consultative exam by Dr. Shana V. Hamilton-Lockwood which took place October 21, 2011, a little over a month after Plaintiff last used alcohol, showed no more than moderate impairments in Plaintiff's abilities to function. (Tr. 297-301).

Turning to the final issue, Plaintiff's credibility, it is obvious that Dr. Greenwood and the ALJ have a disagreement. The determination of credibility is a job assigned to the ALJ rather than a physician. *Allen, supra*, at 562. The ALJ found the Plaintiff to not be completely credible for a variety of reasons. He had before him the entire medical

history as described above. Even Dr. Greenwood's mental status evaluations did not support the Plaintiff's credibility as to the severity of her symptoms. The ALJ noted that the Plaintiff had bursitis at the same level of severity before her alleged onset date and that she worked with that condition. He noted a gap from April 25, 2011 to March 9, 2012 in which Plaintiff sought no mental health treatment. Also, he discussed her daily activities she listed in her function report of preparing simple meals daily, cleaning, painting and doing laundry, and contrasted those to her testimony at the hearing where she said her mother did virtually all the cooking and cleaning for her.

The Court finds that there was substantial evidence to support the ALJ's finding that the Plaintiff was not entirely credible. Also, there is substantial evidence to support his RFC finding and the hypothetical question to the VE, who described a significant number of jobs the Plaintiff could perform in the national and state economies. The ALJ followed the applicable regulations and committed no errors of law. Accordingly, it is respectfully recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 20] be DENIED, and that the Defendant Commissioner's Motion for Summary Judgment [Doc. 22] be GRANTED.[1]

Respectfully submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).